**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| CARGO ON DEMAND, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL NO. |
| | : | |
| POLAR AIR CARGO | : | |
| WORLDWIDE, INC., | : | **JURY TRIAL DEMANDED** |
| Defendant. | : | |

_____

## COMPLAINT

Plaintiff, Cargo On Demand, Inc. ("**COD**") by and through its undesigned counsel, hereby files this Complaint against Defendant, Polar Air Cargo Worldwide, Inc. ("**Polar**"), and in support thereof, avers as follows:

## PARTIES

1.     COD is an air freight forwarding corporation incorporated under the laws of the state of New York, with its principal place of business in Queens, New York.

2.     Polar is a cargo airline incorporated under the laws of the state of Delaware corporation, with its principal place of business in Purchase, New York.

3.     Upon information and belief, at all times material to this Complaint, Polar's operations were overseen and controlled *by at least* one or more of the following members of Polar's most senior management: Lars Winkelbauer, Chief Operating Officer ("**Winkelbauer**"); Thomas Betenia, Vice President of Sales and Marketing;  Abilash Kurien, Vice President of Marketing, Revenue Management and Network Planning;  Carlton Llewellyn, Vice President of Operations Systems Performance and Quality; Robert Schirmer, Senior Director, Customer Service & Capacity; Frank Filimaua, Global Senior Sales Director (collectively "**Polar Management**").

1

## JURISDICTION

4.      Jurisdiction in this matter is based upon 28 U.S.C. §1331, as this is a cause of action arising under the Racketeer Influenced and Corrupt Organizations Act, ("**RICO**") 18 U.S.C. §1964(a).

5.      The Court has supplemental jurisdiction over the state law and common law claims alleged herein pursuant to 28 U.S.C. §1367(a), as those claims are interrelated with the RICO Act claims, and arise from a common nucleus of operative facts, such that their adjudication furthers the interest of judicial economy.

## VENUE

6.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391(b) because Polar resides in this judicial district and because a substantial part of the events giving rise to COD's claims occurred in this district.

## PERSONAL JURISDICTION

7.      This Court has personal jurisdiction over Polar because, *inter alia*, its principal place of business is in New York and it regularly contracts to supply services in New York.

## RELEVANT FACTS

**Freight Forwarding Generally**

8.      As an air freight forwarder, COD acts as an intermediary.  COD consolidates shipments of its customers' goods and then facilitates transportation of those goods via air carrier (typically at a significant discount to its customers as compared to booking each shipment directly with the air carrier).

9.      The air freight forwarding industry is highly competitive.  This can lead to significant demand for a limited supply of air cargo space, particularly on certain air routes.

10.     Customers of air freight forwarders like COD typically determine whether to engage COD or another freight forwarder (or cargo airline directly) based exclusively on which offers the lowest cost on the given route.  This often results in freight forwarders like COD having to accept small profit margins on each individual cargo shipment they consolidate and tender for air transportation.

11.     Air freight forwarders benefit air cargo carriers because freight forwarders enable airlines to sell their available cargo space in bulk, rather than having to enter into a myriad of separate transactions with individual air freight shippers.

12.     Air freight forwarders also, among other things, provide a steady stream of demand (and related profits) to air carriers without the extensive marketing and customer-development efforts/expenditures that would be required to fill cargo space on their own.

13.     But, because the ultimate shipper is the same, air freight forwarders treat their customers' identities, discrete needs, and pricing as extremely commercially sensitive information.

**Polar's Relationship with COD**

14.     COD began operations as an air freight forwarder in 2013.

15.     At all times material to this complaint, COD has been a small freight forwarder in the global transportation industry with annual revenues that were only a small fraction of the largest operators.

16.     At all times material to this Complaint, Polar was a subsidiary of Atlas Air Worldwide and DHL, two of the largest companies in the global transportation industry, with billions of dollars in annual revenue.

17.     In 2014, COD and Polar entered into a Blocked Space Agreement ("**BSA**")
pursuant to which Polar promised to provide COD with a specified allotment of cargo space on
specified air routes at specified rates.

18.     The term of BSA was extended on an annual basis through 2021.  The BSA was
also amended from time-to-time to reflect changes in pricing and/or routing.

19.     This relationship was extended because it was mutually beneficial.  COD's
promotion efforts (particularly in Asia) allowed Polar to significantly increase its visibility,
tonnage revenue, and market share over the course of the parties' relationship.

20.     COD entered into the BSA with Polar primarily because Polar's rates on the
specific air routes relevant to COD's customers were typically lower than the rates quoted to
COD by any other airlines providing service on the same routes.

21.     However, in order to actually utilize its cargo space allotment, COD was advised
by members of Polar Management that it was required to also pay Polar (via Polar Management),
and certain third-party consulting companies connected to Polar, additional "consulting fees"
separate and apart from the BSA.

22.     These consulting fees were charged beginning at the inception of COD's
relationship with Polar in 2014.

23.     The third-party "consulting" companies COD was required to pay in order to ship
goods with Polar included at least: Peryton Consulting, LLC (a Georgia company formed in
2011); 51 Entertainment, LLC (a Wyoming company formed in Louisiana in 2009); Banya LLC
(a Wyoming company formed in 2020); Bizmind LLC (upon information and belief located in
Wilton, CT); Chantalle LLC (upon information and belief located in Port Jefferson Station, NY);

and MAAZ Consulting, LLC (upon information and belief, located in Yonkers, New York) (collectively "**the Consulting Companies**").[1]

24.     In certain instances, members of Polar Management were among the principals of these Consulting Companies.  By way of example, in filings with the state of Wyoming, 51 Entertainment, LLC identified Keith Vogt and Delores Stewart (not known by COD to have any affiliation with Polar) and Winkelbauer (Polar's COO) as the members of the LLC.

25.     By way of further example, Georgia Secretary of State records list Thomas Betenia (Polar Vice President of Sales and Marketing) as a member of Peryton Consulting, LLC.

26.      Additionally, filings with the state of Wyoming suggest that 51 Entertainment, LLC and Banya, LLC operated from the same address: 1621 Central Avenue, Cheyenne, WY 82001.

27.     The consulting fees were calculated based on the monthly tonnage for all goods that COD shipped with Polar.  The amount of the fee typically varied between $0.25-$0.50 per kilo of tonnage, in addition to the agreed BSA rates.

28.     The consulting fee requirement was articulated to COD by multiple members of Polar Management (which included, without limitation, the company's Chief Operating Officer and multiple vice presidents and directors) over the course of seven years.

29.     The similarly situated Polar customers known to COD were also required to pay a consulting fee.

30.     COD did not receive rates from Polar that were any more favorable than what other similarly-situated freight forwarders known to COD received for the same air routes.

---

[1] COD was unable to locate Bizmind, Chantalle, and MAAZ via searches of national secretary of state records.

31.    COD was advised and instructed by Polar Management that these additional "consulting fees" were part of Polar's regular way of doing business with all customers that had annual BSA contracts with Polar.

32.    To COD, such fees seemed akin to a hotel "resort fee".  In other words, a mandatory fee that is not included (or not prominently included) in the quoted rate, yet mandatorily charged at either a flat amount or percentage basis in the final bill.

33.    Also analogous to a resort fee, the "consulting fee" allowed Polar to generate additional cargo revenue by giving the appearance of offering lower rates in comparison to competitors than if Polar had quoted the full (*i.e.* all costs and fees included) cost.

34.    As directed by Polar (via Polar Management), COD and others known to COD typically paid the demanded "consulting" fees via bank wire.

35.    COD, in turn, quoted rates to its own customers in reliance upon the agreed pricing and cargo space allotment set forth in the BSA.

36.    Given the highly competitive nature of the freight forwarding industry, COD was typically unable to pass this consulting cost along to its customers. As a result, COD absorbed the cost of the consulting fees in the form of reduced profit (or no profit at all) on associated cargo shipments.

37.    Additionally, in certain instances COD was required to take out high-interest rate loans in order to pay the additional consulting fees required to ship goods through Polar, despite low profit margins.

38.    In total, between 2014 and 2021, at the express direction of Polar Management, communicated via phone and email, COD paid nearly four million dollars ($4,000,000) in

"consulting fees" to Polar Management and to the Consulting Companies, typically by monthly wire.

39.     Consequently, COD's profits were correspondingly reduced by approximately $4 million (exclusive of interest payments), as compared to freight rates based exclusively on the BSA amounts.

40.     The exact amounts of the consulting fees that COD was required to pay varied from month-to-month depending on the tonnage of cargo COD shipped and the instructions from Polar Management that month.  The customary procedure was that a member of Polar Management (typically vice president Abilash Kurien) would email COD a spreadsheet identifying all COD shipments with Polar from the prior month and the total amount of the monthly "consulting fee" that was due and owing. Kurien would further specify, either by email or phone, how to apportion the consulting fee payments that month among various members of Polar Management and the Consulting Companies.

41.     By way of example, on March 1, 2021, Kurien emailed a spreadsheet to COD demanding a total consulting fee payment of $41,291.93 for shipments COD placed with Polar in late December 2020 and January 2021.  *See* Exemplar Correspondence and Spreadsheet Attached as Exhibit A hereto.  In the cover email, Kurien specified that COD was to pay: $1,000 to MAAZ Consulting, LLC, $1,175.69 to Frank Filimaua (Polar Global Senior Sales Director), and then pay equal shares of $7,823.25 to the remaining recipients for that month, including Bizmind, LLC, 51 Entertainment, LLC, and Peryton Consulting, LLC.

42.     As directed, COD then made the specified payments for that month via ACH wire transfer.

43.     In certain other months, Polar Management utilized a more complicated formula that took into account different regions and customers when computing the total payout amount and recipients.  These formulas were also memorialized in spreadsheets emailed to COD by Polar Management.

44.     In all instances, the payments were made to one or more members of Polar Management and/or their affiliated Consulting Companies at the specific direction of Polar Management, based on the Polar "consulting fee" spreadsheet provided to COD via email for that month.

**PIPA Between COD and Polar**

45.     In late 2020, after COD had been a loyal Polar customer and had paid the consulting fees for approximately six years, Polar approached COD about expanding the parties' relationship and entering into what Polar termed a "partnership".

46.     Specifically, Polar proposed giving COD more favorable cargo rates, via an incentive program, if COD placed all (or nearly all) of its cargo with Polar and shared confidential customer information with Polar.

47.     On January 1, 2021, COD and Polar entered into the Partner Incentive Program Agreement ("PIPA") for the 2021 calendar year.

48.     In reliance on the PIPA, and written representations by Polar that the two parties were acting in "partnership", COD designated Polar as its preferred airline and shared extremely commercially-sensitive information with Polar, including the identity of COD customers and business partners with air cargo needs on Polar routes.

49.     Thinking the parties were acting in partnership for their mutual benefit, COD also directed nearly all of its customers' cargo traffic to Polar, thereby increasing Polar's revenue and profits.

50.     COD took these actions in reliance upon Polar's promise to provide corresponding incentive payouts to COD, the value of which increased based on COD's increased shipping volume with Polar.

51.     In or around the summer of 2021, Winkelbauer (Polar's Chief Operating Officer) directed COD to discontinue the "consulting fee" payments.  COD complied with this directive and ceased making the payments.

52.     Upon information and belief, Winkelbauer thereafter accepted employment with another transportation company.

53.     Shortly after COD ceased making the payments, on August 18, 2021, Polar sent COD a 60-day cancellation notice terminating the agreed BSA pricing for certain flights to Asia, purportedly due to the COVID-19 pandemic.

54.     But, so as to induce COD to continue placing freight with Polar and provide its commercially sensitive customer information, Polar emphasized in the same communication that COD remained a "valued Polar partner" and claimed that Polar was merely:

> Adjusting the terms of our partnership to ensure our service and standards meet your needs is our priority.  The summer 2021 contract ends Sept. 30, 2021.  We are working now to revise the terms of that contract for extension, it will reflect updated language and terms aligned to the service offerings for the next contract period.  As soon as we have the terms drafted, I will reach out to you.  Cargo on Demand is a **valued Polar partner** and I will work expeditiously on reconstructed terms of service to ensure a continued **healthy and productive partnership**. [emphasis added]

55.     Despite these continued assurances and representations to COD that Polar remained COD's "partner", Polar instead intentionally undermined COD's relationship with Polar (and COD's own customers) at every possible opportunity.

56.     Specifically, Polar reduced cargo space available to COD in the midst of peak season, wrongfully reported payment defaults to IATA's Cargo Accounts Settlement Systems (CASS), and prohibited COD from using Polar's e-booking platform to ship customer goods (increasing COD's out-of-pocket costs by 15-20 percent).

57.     In October 2021, Polar further escalated these tactics and placed COD on a cash account.  This action by COD's purported "partner", forced COD to incur an additional 5% charge and handling fee on cargo placed with Polar, completely obliterating COD's ability to continue to offer competitive rates to its customers.

58.     COD was also forced to pre-pay for its customers' shipments with Polar, rather than under the traditional credit terms whereby COD could pay Polar after receiving payment from its own customers.

59.     So as to meet existing customer commitments, despite these actions by Polar, COD was forced to take out a loan of approximately $1 million, on unfavorable terms, to remain in business.

60.     These actions by Polar not only caused COD to lose direct revenue on individual shipments, but also destroyed COD's ability to hit overall shipping volumes with Polar that were necessary to trigger the promised incentive payments under the PIPA.

61.     Additionally, Polar used the information COD disclosed in reliance upon the PIPA - COD's customers, pricing, prospective customers, and other commercial contacts – in

order to solicit COD's customers and business contacts to cut out COD and ship air cargo

directly through Polar.

62.     By taking the aforementioned actions (cash hold, handling fee, termination of

BSA rates, etc.) Polar ensured that COD could not offer rates to its customers that were

competitive with Polar's rates and eliminated COD as a competitor in the air freight marketplace.

63.     On December 20, 2021, *i.e.* with only eleven days' notice, Polar informed COD

that it intended to terminate the parties' relationship altogether, and remove all of COD's cargo

space, as of December 31, 2021.  This action was taken despite Polar's awareness that COD had

customer commitments after that date and that it would effectively cause the immediate closure

of COD's (its purported "partner") business for all intents and purposes.

64.     These actions by Polar in 2021, after COD directed all of its business to Polar and

shared confidential information with Polar in reliance on the PIPA agreement, cumulatively

caused COD to lose virtually all of its customer freight volume, and forced COD to drastically

reduce its active operations.

65.     Additionally, these actions by Polar in 2021 also left COD unable to repay the $1

million loan, with ever-accruing interest, it took out in order to maintain its "partnership" with

Polar.

**Post-Termination Actions by Polar**

66.     In early 2022, COD was contacted by another freight forwarder, FATO LLC

("**FATO**" located in Florida), concerning its own termination under materially-identical

circumstances.

67.     COD learned that Polar's tactics described above - using the promises in a PIPA

to become the customer's exclusive air cargo provider and to obtain extremely sensitive

customer data, initially performing under the agreement and then manufacturing a series of

impediments (withdrawing space, withdrawing credit, negative ratings, etc.) to make

performance practically impossible – were materially identical to the actions it took against a

number of other freight forwarders (including, but not limited to, FATO) at materially-identical

times in 2021.

68. Polar also appears to have sent materially-identical termination communications

to the other freight forwarders known to COD – after poaching all, or nearly all, of their

customers – on or around the exact same dates as the communications to COD.

69. In April 2022, COD sent Polar a letter seeking redress from Polar's wrongful

actions.

70. Via counsel, Polar responded to COD's letter by claiming, *for the first time*, that

its materially-identical and wrongful actions towards COD and others were justified because

Polar Management (including, *inter alia*, its COO and vice presidents) and the Consulting

Companies were found to have engaged in an "illicit" "payment scheme".

71. Via counsel, Polar stated that the "payment scheme" involved, at minimum,

"monthly wire transfers" to an account ultimately controlled by Winkelbauer, Polar's former

Chief Operating Officer. *See* Correspondence attached as Exhibit B hereto.

72. Polar's subsequent correspondence to COD expressly stated that the seemingly-

legitimate "consulting" fees it paid were actually an "illicit" "payment scheme" perpetrated by

"Polar management". Polar did not even attempt to expressly deny that Polar (to the extent that it

can be disassociated from its own senior management) was fully aware of the payments. *See*

Correspondence attached as Exhibit C hereto.

73.    While it freely acknowledged that "Polar management" perpetrated an "illicit" "payment scheme", and that the demanded consulting fee payments were part and parcel of that scheme, Polar falsely claimed that the scheme did not harm COD.

74.    Moreover, despite now claiming to have intentionally terminated its relationship with COD because it made the "consulting fee" payments demanded by Polar and its management, Polar admittedly continued to do business with COD and other victims for several months *after* the point Polar (via counsel) now claims to have been well aware of the scheme.

75.    Despite now claiming to have intentionally terminated its relationship with COD because it made the "consulting fee" payments demanded by Polar and its management, Polar admittedly continued to do business with COD and other victims of the scheme for several months *after* the point Polar (via counsel) now claims to have been well aware of the scheme.

76.    Despite now claiming to have intentionally terminated its relationship with COD because it made the "consulting fee" payments demanded by Polar and its management, Polar continued to hold itself out at COD's "partner" and actively induced COD to continue shipping virtually all of its cargo with Polar.

77.    Despite now claiming to have intentionally terminated its relationship with COD because it made the "consulting fee" payments demanded by Polar and its management, Polar did not *contemporaneously* state or suggest that COD's payment of the "consulting fees" (or perhaps its *failure* to continue paying the fees) was the justification for any of its harmful actions towards COD.

78.    Polar only revealed that the "illicit" "scheme" perpetrated by "Polar management" was the true basis for its actions towards COD well *after* COD's termination, and *after* receiving

legal letters from COD and others seeking redress for Polar's wrongful (and materially-identical) misconduct towards COD and other victims of the admitted "scheme".

79.    Upon information and belief, Polar has not pursued any criminal action against any member of Polar Management or the Consulting Companies in connection with what Polar itself calls an "illicit" "payment scheme" involving "Polar management".  Upon information and belief, Polar has not even reported this "illicit" "payment scheme" to law enforcement.

80.    Upon information and belief, Polar has not pursued any civil action against any member of Polar Management or the Consulting companies in connection with this "illicit" "payment scheme".

81.    Upon information and belief, neither Polar nor its publicly-traded parent companies have made any public disclosure (whether to shareholders or otherwise) of an "illicit" multi-year, multi-million dollar "payment scheme" involving multiple customers and its most senior management.

82.    Upon information and belief, Polar officers, directors, and employees who (directly or indirectly) received consulting-fee payments from COD and others remain employed by Polar.

83.    Members of Polar Management who have now accepted employment at other companies still publicly advertise their successful prior employment with Polar.

84.    In certain instances, the requirement that COD pay "consulting fees" to Polar executives in specified leadership positions within its operations department carried over when there was a change to the executive employed in those leadership positions.

85.    To the extent that Polar truly did decide to terminate COD in or around the summer of 2021 due to "Polar management['s]" "payment scheme", as it now claims, this would

mean Polar *intentionally* misled COD when it made subsequent representations to COD that Polar remained COD's "partner", and by actively inducing COD to continue shipping virtually all of its cargo traffic with Polar (and even take out loans to do so).

86.     To the extent that Polar truly did decide to terminate COD in or around the summer of 2021 due to "Polar management['s]" "payment scheme", as it now claims, this would mean Polar *intentionally* undermined COD's relationships with Polar and COD's own customers in the second half of 2021 and *knowingly* misled COD via the use of false pretenses specifically designed to ensure COD would fail to meet PIPA targets.  For example, by, among other things: Polar reducing cargo space in the midst of peak season, wrongfully reporting payment defaults to IATA's Cargo Accounts Settlement Systems (CASS), preventing use of Polar's e-booking platform to ship customer goods (increasing COD's out-of-pocket costs by 15-20 percent), requiring pre-payment for shipments in cash, and then eventually refusing to provide any cargo space whatsoever.

## <u>COUNT I – RICO VIOLATION UNDER 18 U.S.C. 1962(c)</u>

87.     COD incorporates the preceding paragraphs as if fully set forth herein.

88.     The Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §1961 – 1968 ("RICO"), provides the right for "any person injured in his business or property by reason of violation of section 1962" to pursue a private civil action to recover treble damages (18 U.S.C. §1964(c)).

89.     At all relevant times, COD was a "person" within the meaning of RICO, 18 U.S.C. §1961(3) and §1964(c).

90.     Under 18 U.S.C. §1962(c), it is unlawful "for any person employed by or associated with any enterprise…to conduct or participate, directly or indirectly, in the conduct of such enterprise's affair through a pattern of racketeering activity…."

91.     At all relevant times, Polar was a "person" within the meaning of RICO, 18 U.S.C. §1961(3) and §1964(c).

92.     In the case of a corporation, which can act only through its agents, the actions of corporate directors and officers are attributable to the corporate entity.

93.     With respect to COD and other customers, Polar acted through Polar Management, which included Chief Operating Officer, vice presidents, and directors (among others).

94.     Upon information and belief, and in reliance upon representations *by Polar itself*, Polar, Polar Management, and the Consulting Companies formed an association-in-fact enterprise (the "**Enterprise**"), as defined by 18 U.S.C. §1961(4) that was engaged in an "illicit" "payment scheme" involving transportation of goods by air—activities that effected interstate commerce within the meaning of 18 U.S.C. §1962(c).

95.     The structure and purpose of the Enterprise involved deceiving customers into making millions of dollars in ostensibly legitimate "consulting fee" payments, at a specified amount corresponding to the weight of its shipments and other factors, that were actually a part of a wire fraud and tax evasion scheme designed to enrich and benefit Enterprise members.

96.     At all relevant times, and at least between 2014 and 2021, Polar knowingly and willfully associated with the Enterprise and conducted, and participated in the conduct of, the Enterprise's affairs, directly or indirectly, through "pattern of racketeering activity" within the meaning of RICO, as prohibited by 18 U.S.C. §1962.

97.     As a corporation, Polar may be held liable for the acts of its managerial agents done on behalf of and to the benefit of the corporation and directly related to the performance of the duties the employee has authority to perform.

98.     The obligation to pay the "consulting fees", as a pre-condition to utilizing Polar's cargo space for designated air routes, was communicated by Polar's Chief Operating Officer, multiple vice presidents, and others with actual and apparent authority to speak on behalf of Polar.

99.     Corporations also may also be held liable for the conduct of their supervisory employees who, as is the case here, have either intentionally disregarded the law or acted with plain indifference to its requirements.

100.    By Polar's own admission, "Polar management" perpetrated a "scheme" to obtain "illicit payments" from customers via "monthly wire transfers".  These admittedly-illicit acts were willful and demonstrate an intent to defraud COD, other freight forwarding companies, and the United States Treasury.

101.    Additionally, in furtherance of the scheme, when COD and other intermediaries ceased making "consulting fee" payments, Polar immediately took punitive action against them using a materially-identical course of conduct, including: customer poaching, reducing cargo space in the midst of peak season, wrongfully reporting payment defaults to IATA's Cargo Accounts Settlement Systems (CASS), preventing use of Polar's e-booking platform to ship customer goods (increasing out-of-pocket costs by 15-20 percent), requiring pre-payment for shipments in cash, and then eventually refusing to provide any cargo space whatsoever.

102.    In addition to its legal and legitimate activities, if any, the Enterprise was used for racketeering activities. Specifically, for at least seven years, the members of the Enterprise

engaged in "racketeering activity" within the meaning of 18 U.S.C. §1961(1)(B) by engaging in the acts outlined in this Complaint, most notably its pattern and practice of requiring that COD and other Polar customers pay additional and seemingly-legitimate "consulting fees" (calculated at a fixed rate based on tonnage) via wire to secure cargo space on Polar aircraft, when, *according to Polar itself*, that fee was actually part of an "illicit" "scheme".

103.    These acts referred constitute a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. §1961(5).  The acts alleged were related to each other by virtue of common participants, common victims, a common method for commission, and the common purpose and common result of racketeering activities being interrelated by distinguishing characteristics.  The predicate acts committed by Polar had the common purpose and common result of inducing COD, and other freight forwarders to make seemingly legitimate, but actually "illicit", payments as part of a "scheme" to enrich the members of the Enterprise.

104.    Additionally, the predicate acts detailed above constitute a "pattern of racketeering activity" and demonstrate continuity as the racketeering acts extended over a period of at least seven (7) years.

105.    Indeed, based on the facts alleged herein, and materially-identical conduct towards all known victims of the "scheme", the racketeering activity was simply the regular way of doing business for Polar with respect to similarly-situated intermediaries.

106.    Participation in this scheme necessarily had numerous benefits to Polar, including allowing Polar to increase freight volumes (and associated profits) by quoting a deceptively-low freight rate to customers that made Polar's rates appear more desirable to customers than if it had quoted the true cost of Polar's services.

107.    Among other benefits, this scheme also allowed Polar to receive "off the books" income, without payment of applicable taxes and associated accounting consequences.

108.    Among other benefits, this scheme of funneling mandatory consulting fee payments directly to Polar Management also necessarily allowed Polar to compensate its senior executives in a manner in excess of what was disclosed to shareholders (including the shareholders of its parent companies), and allowed Polar to wrongfully avoid significant applicable payroll tax-liability on this executive compensation.

109.    Among other benefits, this scheme also allowed Polar to obtain highly commercially-sensitive data from its victims and then use the data to directly solicit business from its victims' customers.

110.    The facts above also demonstrate that Polar, via Polar Management, *admittedly* used interstate wires (including bank transfers, emails, and interstate telephone) for the purpose of executing an "illicit" "payment scheme". Each act of wire fraud and/or tax evasion was directed or approved by one or more of the Enterprise's members.

111.    Because the Enterprise's members solicited, and received, these "consulting fee" payments by interstate wire, these acts constitute wire fraud and a violation of 18 U.S.C. §1343, which prohibits anyone from "[h]aving devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire…in interstate or foreign commerce…."

112.    As part of the Enterprise, Polar, via Polar Management, also committed and caused others to commit multiple acts of wire fraud and tax evasion over a substantial amount of time, as demonstrated herein, from at least 2014 through at least 2021.

113.   Additionally, because Polar Management used facilities engaged in interstate or foreign commerce (namely a cargo airline and airports) - and travelled in interstate commerce from New York to Connecticut, California, and other states - in order to, upon information and belief, to launder the "consulting fee" payments through the respective Consulting Companies and conduct other unlawful activity, the Enterprise's members also committed violations of 18 U.S.C. § 1952.

114.   COD has, along with other victims of this fraudulent scheme (both currently known and unknown), incurred substantial injury to its business and financial losses that were proximately caused by the Enterprise's conduct.

115.   Polar's actions in violation of 18 U.S.C. 1962(c), directly and proximately caused COD to be injured in its business and property within the meaning of 18 U.S.C. 1964(c) in an amount to be determined upon trial of this action, but it is believed to be an amount of not less than $6 million, which sum is to be duly trebled in accordance with 18 U.S.C. §1964.

116.   These damages include the more than $4 million in "consulting fee" payments as part of the "payment scheme" devised by "Polar management", loan interest, lost profits, loss of goodwill, loss of business reputation, and loss of reasonably-anticipated future profits.

117.   The pattern of racketeering activity by the members of the Enterprise was the proximate cause of COD's injury.

118.   As part of the Enterprise, Polar engaged in gross fraud, wantonness, maliciousness, and/or the willful disregard for the rights of others.  Accordingly, COD is also entitled to recover punitive damages.

119.   COD is also entitled to recover reasonable attorneys' fees and costs pursuant to 18 U.S.C. §1964(c).

120. Under the RICO statute, each member of the Enterprise is jointly and severally liable for the full amount of damage caused.

121. Accordingly, COD may recover its full damages from Polar. It is not required to attempt to also recover from individual members of Polar Management – some of whom are now (upon information and belief) deceased and/or have fled to foreign countries that do not recognize U.S. judgments – or the Consulting Companies.

**WHEREFORE**, COD demands judgment against Polar in an amount to be proved at trial, as well as punitive damages, treble damages, any other costs, fines or assessments resulting from Polar's fraudulent wire fraud and tax evasion scheme, including without limitation to accrued interest, expenses, attorneys' fees and other costs incurred in this matter and for such other relief as the Court deems just and proper.

## COUNT II – RICO CONSPIRACY UNDER 18 U.S.C. §1962(d)

122. COD incorporates the preceding allegations as if fully set forth herein.

123. 18 U.S.C. 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketing activity. 18 U.S.C. §1962(d) makes it unlawful to "conspire to violate [18 U.S.C. 1962 (c)]." Thus, 18 U.S.C. §1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

124. Polar, through its senior leadership, conspired and agreed to engage in the conduct detailed above, and also conspired and agreed to engage in wire fraud and tax evasion.

125. Polar agreed to conduct or participate in the conduct of the Enterprise's affairs through a pattern of ongoing activity consisting of repeated violations of the federal wire fraud statute and the nation's tax laws.

126.    Polar's knowledge of, and acquiescence to, the overall objective of the scheme is demonstrated at this time, *prior to any discovery*, by the fact that:

    a.   Via counsel, Polar has *admitted* the existence of an "illicit . . . payment scheme" involving senior "Polar management", including Winkelbauer (Polar's Chief Operating Officer) and 51 Entertainment, LLC;

    b.   Via counsel, Polar has *admitted* that the scheme involved "monthly wire transfers" to a bank account controlled by Winkelbauer;

    c.   The scheme was perpetrated by Polar Management for at least seven years;

    d.   Upon information and belief, the demand for payment of a "consulting fee" extended to all similarly-situated freight forwarders having a BSA with Polar;

    e.   Immediately after COD and others discontinued making the mandatory "consulting fee" payments when Winkelbauer left the company, Polar took the materially-identical retaliatory actions against COD and others described herein;

    f.   Despite its admitted awareness of an "illicit" "payment scheme" involving "monthly payments by wire" to "members of Polar management" and the involvement of skilled outside counsel, upon information and belief, Polar has not reported the scheme to law enforcement nor taken any legal action against the scheme's perpetrators;

    g.   Despite its admitted awareness of an "illicit" "payment scheme" involving "monthly payments by wire" to "members of Polar management" and the involvement of skilled outside counsel, upon information and belief, neither Polar nor its publicly-traded parent companies made any public disclosure,

whether to shareholders or otherwise, of the multi-year, multi-million dollar
scheme;

h.   In certain instances, the requirement that COD pay "consulting fees" to Polar
executives in specified leadership positions within its operations department
carried over when there was a change to the executive employed in those
leadership positions; and

i.   Polar has never denied having awareness of the "scheme" in dealings with
COD.

127.   For these and other reasons, Polar knowingly and intentionally permitted and
acquiesced to the Enterprise's conduct.

128.   Additionally, corporations also may be held liable under RICO for the conduct of
supervisory employees who, as is the case here, have either intentionally disregarded the law or
acted with plain indifference to its requirements.

129.   Here Polar acknowledges that "Polar management", including at least
Winkelbauer (its former Chief Operating Officer), were involved in an "illicit" "payment
scheme" involving "monthly payments by wire". So, by Polar's own admission, Polar may also
be held liable for having knowledge of, and having acquiesced to, the overall objective of the
scheme based on the undisputed actions of its supervisory employees.

130.   Polar agreed to conduct or participate in the conduct of the Enterprise's affairs
through a pattern of ongoing activity consisting of repeated violations of the federal wire fraud
statute and tax evasion.

131.   Polar agreed to and directed that the racketeering activity of wire fraud and tax
evasion be conducted by the Enterprise.  Such agreement is evidenced by the repeated wire

transfers, emails, and phone calls, in furtherance of an "illicit" "payment scheme", that were made to COD and others at the request of Polar, via Polar Management, for a period of at least seven years.

132.    Additionally, because Polar Management used facilities engaged in interstate or foreign commerce (namely a cargo airline and airports) - and travelled in interstate commerce from New York to Connecticut, California, and other states in order to, upon information and belief, launder the "consulting fee" payments through the Consulting Companies and conduct other unlawful activity - the Enterprise's members also committed violations of 18 U.S.C. § 1952.

133.    This scheme had numerous benefits to Polar, including allowing Polar to increase freight volumes (and associated profits) by quoting a deceptive freight rate to customers that (exclusive of the mandatory "consulting fee") made Polar's rates appear lower, and thus more desirable to customers, than the true cost of Polar's services.

134.    Among other benefits, this scheme also allowed Polar to receive "off the books" income, without payment of applicable taxes and associated accounting consequences.

135.    Among other benefits, this scheme of funneling mandatory consulting fee payments to Polar Management, also necessarily allowed Polar to compensate its senior executives in a manner in excess of what was disclosed to shareholders, and allowed Polar to wrongfully avoid significant applicable payroll tax-liability on this executive compensation.

136.    COD and others have been, and continue to be, injured in their business and property within the meaning of 18 U.S.C. §1964(c) in an amount to be determined upon at the time of trial of this action, which is to be duly trebled in accordance with 18 U.S.C. §1964(c).

**WHEREFORE**, Plaintiff COD demands judgment against COD in an amount to be proved at trial, as well as treble damages, punitive damages, any other costs, fines or assessments resulting from Polar's wrongful conduct, together with accrued interest, expenses, attorneys' fees, and other costs incurred in this matter and for such other relief as this Court deems just and proper.

## COUNT III – FRAUD

137.    COD incorporates the preceding paragraphs as though fully set forth herein.

138.    Polar's conduct as detailed herein - most notably its representation to COD and others, via Polar Management, that payment of a "consulting fee" was necessary to ship cargo with Polar, at the rates set forth in the BSA - constituted a material misrepresentation of fact which Polar knew to be false.

139.    According to information recently revealed by Polar itself, these mandatory payments were not actually required components of the larger transportation charge but instead payments to further an "illicit" "payment scheme" run by Polar, Polar Management, and the Consulting Companies.

140.    Had Polar allowed COD to move its customers' goods for the rates set forth in the BSA without payment of this additional fee, COD would have saved at least $4 million between 2014 and the present.

141.    Had Polar allowed COD to move its customers' goods for the rates set forth in the BSA without payment of this additional fee, COD would not have needed to take out loans from third-parties at high interest rates.

142.    Moreover, Polar knew or reasonably should have known that its additional false representations in the PIPA that it intended to act as COD's partner, and make certain volume-

based incentive payments to COD, would induce COD to disclose extremely-sensitive customer information and ship virtually all of its cargo through Polar.

143.    Polar made the above-detailed misrepresentation for the purpose of inducing COD to rely on these representations.

144.    In the summer of 2021, Polar also induced COD to continue placing cargo shipments with Polar, by continuing to hold COD out as its partner and continuing to promise preferential incentive payments, when, *according to Polar itself*, Polar claims it had already decided to terminate its relationship with COD  (and other freight forwarding companies) because it had previously made the "consulting fee" payments demanded by Polar Management.

145.    Had COD been made aware that the PIPA was, in actuality, essentially a vehicle for Polar to discover and then poach COD's customers and commercially-sensitive information, COD never would have: entered into the PIPA, listed Polar as its preferred air carrier, disclosed sensitive customer information to Polar, and/or continued to place virtually all of its cargo shipments with Polar.

146.    Had COD been made aware of Polar's true intentions, COD would not have taken out loans from third-parties in order to pre-pay for customer shipments in late 2021, as newly demanded by Polar (which now claims it had already decided to terminate its business relationship with COD due to the consulting fee payments).

147.    Had COD been made aware of Polar's true intentions, COD would not have paid Polar the additional fees that arose from COD being unable to use the e-booking platform.

148.    Upon information and belief, Polar's actions in the second half of 2021, as detailed herein, occurred shortly thereafter COD and others ceased making payments of the "consulting fees" at the direction of Winkelbauer.

149.    Upon information and belief, these acts of concealment by Polar were for the purpose of avoiding public disclosure of what Polar has now revealed to have been an "illicit" "payment scheme" by senior "Polar management".

150.    These acts also allowed Polar to poach the customers of COD and others while under the false belief that they were Polar "partners".  These acts allowed Polar to generate direct revenue from the customers of COD and others, without having to pay for their services as intermediaries, or incur the time and expense of general solicitation efforts.

151.    Polar intended for COD to rely upon its promises and representations that Polar would act as its partner, when Polar knew that this was not the case, in order to (upon information and belief) poach COD's customers and eliminate competition for cargo customers on air routes served by Polar.

152.    COD justifiably relied on Polar's misrepresentations regarding the consulting fee payments because the requirement to pay this additional percentage was communicated by Polar Management, including its Chief Operating Officer and vice presidents.  Additionally, the requirement to make this payment was not unique to COD; it was similarly required of other similarly-situated Polar customers known to COD.

153.    COD also justifiably relied upon Polar's representations regarding the PIPA incentive payments because they were memorialized in a written contract executed by an authorized Polar representative.

154.    As a result of Polar's fraudulent conduct, and COD's subsequent justifiable reliance thereon, COD suffered significant damages including: making nearly $4 million in unnecessary "consulting" payments, costs and interest on loans taken out by COD to pay Polar,

unnecessary fees and costs paid to Polar, the loss of nearly all of its customers and future revenue, and the effective closure of its business.

155.    Further, in the case of a corporation like Polar, which can act only through its agents, the actions of corporate directors and officers are attributable to the corporate entity.

156.    Specifically, a principal is liable for an agent's fraud, *even if the agent acts solely to benefit himself*, if the agent acts with apparent authority.

157.    Here Polar Management (including its Chief Operating Officer, vice presidents, and others) had apparent authority to specify the terms under which Polar would transport COD's freight.

158.    While Polar itself did indeed receive numerous benefits as a result of the "illicit" "payment scheme", Polar may also be held liable for defrauding COD even if members of Polar Management acted solely to benefit themselves.

**WHEREFORE**, Plaintiff COD demands judgment against Polar in an amount to be proved at trial, as well as punitive damages, any other costs, fines or assessments resulting from Polar's fraudulent actions, together with accrued interest, expenses, attorneys' fees, and other costs incurred in this matter and for such other relief as this Court deems just and proper.

## COUNT IV – AIDING AND ABETTING

159.    COD incorporates the preceding paragraphs as though fully set forth herein.

160.    As set forth herein, Polar admits the existence of an "illicit" "payment scheme" involving "monthly payments by wire" to "members of Polar management" and others.

161.    As set forth herein, Polar provided substantial assistance to advance the fraud's commission.

162.     As a result of this fraudulent conduct, and COD's subsequent justifiable reliance thereon, COD suffered significant damages including: making nearly $4 million in unnecessary consulting payments, costs and interest on loans taken out by COD to pay Polar, the loss of all of its customers and future revenue, and additional debt.

**WHEREFORE**, Plaintiff COD demands judgment against Polar in an amount to be proved at trial, as well as punitive damages, any other costs, fines or assessments resulting from the fraudulent actions aided and abetted by Polar, together with accrued interest, expenses, attorneys' fees, and other costs incurred in this matter and for such other relief as this Court deems just and proper.

## COUNT V – COMMON LAW CONSPIRACY

163.     COD incorporates the preceding paragraphs as though fully set forth herein.

164.     By Polar's own admission, "Polar management" entered into an "illicit" "payment scheme", which is a corrupt agreement between two or more persons.

165.     As set forth herein, Polar, via Polar Management, demanded "monthly payments by wire" from COD and others for a period of at least seven years in furtherance of the payment scheme.

166.     While Polar customers like COD were told that these monthly payments were for legitimate "consulting fee" charges, Polar now has acknowledged that these fees were actually part and parcel of the "illicit" "payment scheme" perpetrated by members of "Polar management" and the Consulting Companies.

167.     As outlined herein, the participation of Polar, Polar Management, and the Consulting Companies was intentional and conferred benefits to all involved.

168.    Additionally, Polar is responsible for the wrongful conduct of its executives and management, acting with apparent authority, as set forth herein.

169.    As a result of this conduct, COD suffered significant damages including: making nearly $4 million in unnecessary consulting payments, costs and interest on loans taken out by COD to pay Polar, the loss of all of its customers and future revenue, and additional debt.

**WHEREFORE**, Plaintiff COD demands judgment against Polar in an amount to be proved at trial, as well as punitive damages, any other costs, fines or assessments resulting from Polar's involvement in the conspiracy, together with accrued interest, expenses, attorneys' fees, and other costs incurred in this matter and for such other relief as this Court deems just and proper.

## COUNT VI – UNFAIR TRADE PRACTICES

170.    COD incorporates the preceding paragraphs as though fully set forth herein.

171.    Over the course of its relationship with COD, Polar provided transportation services of consumer goods, as defined by the New York Unfair Trade Practices Act ("**NYUTPA**"), most commonly infant formula being used by families within New York and other locations.

172.    As such, Polar engaged in the practice of providing consumer services, as defined by section 20-700 of the NYUTPA, and COD was a consumer of those services.

173.    The NYUTPA prohibits engaging in "any deceptive or unconscionable trade practice in the sale of any consumer . . . services" and permits a private cause of action against corporations that fail to comply with this prohibition.

174.    Polar's actions described herein, including (but not limited to) its deceptive conduct in conjunction with the consulting fees that were actually an admitted "payment

scheme" perpetrated by "Polar management", and its efforts to use PIPA agreements to poach the customers of COD and others, were deceptive and/or unconscionable practices within the ambit of the NYUTPA.

175.    Such conduct has resulted in, and will continue to result in, significant and ascertainable losses to COD, as set forth herein.

**WHEREFORE**, Plaintiff COD demands judgment against Polar in an amount to be proved at trial, as well as treble damages, punitive damages, any other costs, fines or assessments resulting from Polar's deceptive and unconscionable actions, together with accrued interest, expenses, attorneys' fees, and other costs incurred in this matter and for such other relief as this Court deems just and proper.

### COUNT VII – BREACH OF CONTRACT
**(IN THE ALTERNATIVE)**

176.    COD repeats the allegations set forth above as if fully set forth herein.

177.    In or around 2014, COD and Polar entered into the BSA, which was a valid and binding agreement between the parties.

178.    Via various amendments, COD and BSA agreed to extend the terms of the BSA through at least 2021.

179.    Additionally, in January 2021, COD and Polar entered into the PIPA, which was also a valid and binding agreement (PIPA and BSA collectively "**the Agreements**").

180.    Via the BSA, Polar agreed to provide air transportation for COD over specified air routes and at specified pricing for a defined time period.

181.    Despite this unambiguous promise in the BSA, and COD's full performance of its own contractual obligations, Polar failed and/or refused to honor these agreed terms and instead manufactured impediments to prevent COD from being able to actually utilize the BSA.

182.     Additionally, via the PIPA, Polar represented that it would act as COD's "partner" and make certain incentive payments to COD if it hit certain performance targets.

183.     Despite this unambiguous promise in the BSA, and COD's full performance of its own contractual obligations, Polar failed to act as COD's partner and (as set forth herein) actively worked to make it practically impossible for COD to actually receive any incentive payments.

184.     Polar now seeks to justify its breaches on the basis that it allegedly uncovered a "scheme" involving senior management at Polar.  However, such an explanation (even if true), was never contemporaneously raised with COD, or any other known customers, at the time of Polar's conduct.

185.     This new explanation also suggests that Polar knew that the prior explanations it provided to COD for its actions (COVID-19, need for cash hold, CASS ratings, etc.) were false and yet intentionally made them anyway, in deliberate breach of the parties' Agreements, presumably in an effort to keep COD and others performing their end of the Agreements.

186.     These breaches violated the express terms of the Agreements, as well as the implied covenant of good faith and fair dealing, and caused significant actual and prospective damages to COD, as set forth herein.

187.     Such conduct by Polar, particularly in the second half of 2021, also constituted bad faith and destroyed COD's ability to receive the fruits of its Agreements with Polar.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order granting judgment for COD and against Polar in an amount to be proved at trial, plus interest, costs, attorney's fees, and such further relief as the Court deems appropriate.

## COUNT VIII – TORTIOUS INTERFERENCE
## WITH PROSPECTIVE CONTRACTUAL RELATIONS
### (IN THE ALTERNATIVE)

188.    COD repeats the allegations set forth above as if fully set forth herein.

189.    As set forth herein, COD's business as a freight forwarder involved arranging air freight transportation for customers with air freight shipping needs.

190.    Polar was unquestionably aware of these customer relationships and, via the aforementioned conduct in 2021 after COD ceased making consulting fee payments, Polar intentionally interfered with (and actively sought to poach) COD's customers and have them work with Polar directly.

191.    As discussed herein, Polar induced COD to provide customer information to Polar through the false promises of partnership and incentive fee payouts.

192.    As described herein, Polar's actions demonstrate that it acted out of malice and/or used dishonest, unfair, or improper means.

193.    These improper actions by Polar have enriched Polar at COD's expense.

194.    These improper actions by Polar have caused COD to, among other things, lose virtually all of its former customer relationships and the effective closure of its business.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order granting judgment for COD and against Polar in an amount to be proved at trial, plus costs, attorney's fees, and any further relief the Court deems appropriate.

### Jury Trial Demanded

Plaintiff hereby demands a jury trial on matters so triable.

Respectfully submitted this 2nd day of December, 2022,

**FLASTER GREENBERG PC**

By:    */s/ Chris J. Merrick*
          Chris J. Merrick
          NY ID: 5984356
          Yoninah R. Orenstein
          NY ID: 4678249
          One Tower Bridge
          100 Front Street, Suite 100
          Conshohocken, Pennsylvania 19428
          *and*
          295 Madison Avenue, 12th Floor
          New York, NY 10017
          T: 215.279.9909
          F: 610.260.4447
          chris.merrick@flastergreenberg.com
          yoninah.orenstein@flastergreenberg.com