UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
               :
CARGO ON DEMAND, INC.,        :
               :
         Plaintiff,    :
               :    22-CV-10243 (JMF)
    -v-           :
               :    OPINION AND ORDER
POLAR AIR CARGO WORLDWIDE, INC.,   :
               :
         Defendant.  :
               :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

  Plaintiff Cargo On Demand, Inc. ("COD") is a freight-forwarding company that arranges transportation for its customers' goods via air carrier.  ECF No. 1 ("Compl."), ¶¶ 1, 8.  Defendant Polar Air Cargo Worldwide, Inc. ("Polar") is a cargo airline, with which COD contracted to ship goods.  *Id.* ¶¶ 2, 17.  COD alleges that Polar defrauded it of at least four million dollars by charging illicit fees, poaching COD's customers, and abruptly terminating the parties' contract.  *Id.* ¶¶ 38-39, 61-63.  COD brings claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968, and various state-law claims.  Polar now moves, pursuant to Rules 9(b) and 12(b) of the Federal Rules of Civil Procedure, to dismiss the Complaint in its entirety.  ECF No. 13.  For the reasons that follow, Polar's motion is GRANTED and COD's Complaint is dismissed, albeit with leave to amend.

## BACKGROUND

  The following brief factual summary is drawn from the facts alleged in the Complaint, which are taken as true and construed in the light most favorable to COD for purposes of this motion, as well as from documents attached to, and incorporated by reference in, the Complaint.

*See, e.g.*, *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018);

*Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

Established in 2013, COD is an air freight forwarder based in Queens, New York. Compl. ¶¶ 1, 8, 14.  COD works with customers to consolidate their goods and ship them via air. *Id.* ¶ 8.  To do so, COD reserves space in bulk with cargo airlines. *Id.* ¶ 11.  In 2014, COD and Polar — a subsidiary of Atlas Air Worldwide and DHL — entered into a Blocked Space Agreement ("BSA"), pursuant to which COD agreed to pay Polar for an allotment of cargo space on specific air routes. *Id.* ¶¶ 2, 16-17.  The parties renewed the BSA annually through 2021, updating it to reflect changes in both pricing and routes. *Id.* ¶ 18.  The agreement benefitted COD because Polar's rates were typically lower than those of similar cargo airlines. *Id.* ¶ 20.

From the beginning of the relationship between the two companies, certain Polar executives (collectively, "Polar Management") advised COD that, to use its cargo space allotment, COD needed to pay Polar Management and various third-party consulting companies additional "consulting fees" on top of the rates quoted in the BSA. *Id.* ¶¶ 21-22, 28; *see also id.* ¶¶ 40-42 (describing the customary procedure for charging these fees).  Some members of Polar Management were also principals of these third-party consulting companies. *Id.* ¶¶ 23-26.

All told, COD paid nearly $4 million in these "consulting fees" to Polar Management. *Id.* ¶ 38.  COD claims that these fees injured its business because, given the competitive nature of the freight-forwarding industry, it often could not pass on the additional fees to its customers and, at times, needed to take out high-interest loans to cover the fees. *Id.* ¶¶ 36-37.  According to COD, "similarly situated Polar customers" were also required to pay such fees. *Id.* ¶ 29.  COD later found out, from Polar's counsel, that the consulting fees were actually part of an "'illicit' 'payment scheme' perpetrated by 'Polar Management.'" *Id.* ¶¶ 70-72.

On January 1, 2021, COD and Polar entered into a different agreement — the Partner Incentive Program Agreement ("PIPA") — pursuant to which Polar agreed to provide more favorable cargo rates in exchange for COD's confidential customer information. *Id.* ¶¶ 46-50. In the summer of 2021, however, Polar's Chief Operating Officer, Lars Winkelbauer, directed COD to stop paying the consulting fees. *Id.* ¶ 51. Shortly thereafter, Polar sent COD a sixty-day notice terminating the agreed-upon pricing for certain flights, ostensibly due to COVID-19. *Id.* ¶ 53. At the same time, Polar reassured COD that COD remained a valued partner. *Id.* ¶ 54.

COD alleges that, despite these reassurances, Polar took actions to harm its business, including: reducing the cargo space available to COD; placing COD on a cash account and requiring COD to pay an extra 5% for its shipments; requiring COD to pre-pay for shipments rather than ship on credit; and poaching COD's customers. *Id.* ¶¶ 55-58, 61. COD took out a $1 million loan to pay the additional costs imposed by Polar. *Id.* ¶ 59. Finally, on December 20, 2021, Polar informed COD that it intended to terminate their relationship, effective December 31, 2021. *Id.* ¶ 63. In early 2022, COD learned that Polar terminated other freight forwarders, including FATO LLC, under materially identical circumstances. *Id.* ¶¶ 66-68.

COD contacted Polar seeking redress for the harms to its business; in response, Polar's counsel explained that Polar Management and the third-party consulting companies had been engaged in an illicit payment scheme. *Id.* ¶¶ 69-72, 78. COD appears to doubt the sincerity of this justification, claiming that Polar continued to do business with COD even after discovering the illicit payment scheme, *id.* ¶¶ 74-76, and that Polar did not contemporaneously reveal that the scheme was the reason for its termination of the parties' relationship, *id.* ¶¶ 77-78.[1]

---

[1]     COD also alleges, upon information and belief, that "Polar has not pursued any criminal action against any member of Polar Management or the Consulting Companies." *Id.* ¶ 79. After COD filed the Complaint, however, the United States Attorney's Office for this District brought

In its Complaint, COD brings two federal claims: a substantive RICO claim under 18

U.S.C § 1962(c) and a RICO conspiracy claim under 18 U.S.C. § 1962(d).  Compl. ¶¶ 87-136.

COD also brings six claims under New York state law, for: fraud, aiding and abetting fraud,

common-law conspiracy, unfair trade practices, breach of contract, and tortious interference with

prospective contractual relations.  *Id.* ¶¶ 137-194.

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts

set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See*,

*e.g.*, *Empire Merchs.*, 902 F.3d at 139; *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122,

124 (2d Cir. 2008).  A plaintiff's claims will survive a motion to dismiss, however, only if it

alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550

U.S. at 556).  Thus, a plaintiff must show "more than a sheer possibility that [the defendant] has

acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim,

*Twombly*, 550 U.S. at 555.  If a plaintiff's pleadings "have not nudged [its] claims across the line

from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

---

charges against several Polar executives and owners of several Polar customers or vendors —
including Patrick Lau, *the operator of COD* — for wire fraud and conspiracy to commit wire
fraud. *See United States v. Winkelbauer*, 23-CR-133 (JMF), ECF No. 3 (S.D.N.Y.).  According
to the Indictment, Polar "reported the conduct to law enforcement authorities" in or about July
2021. *See id.* ¶ 35.

**DISCUSSION**

As noted, COD brings two claims under federal law, a substantive RICO claim and a

RICO conspiracy claim, as well as various claims under New York law.  Polar moves to dismiss

the former for failure to state a claim and the latter for lack of subject-matter jurisdiction.  ECF

No. 15 ("Def.'s Mem.").  The Court will address each set of claims in turn.

**A. RICO Claims**

The RICO Act creates a private cause of action for "[a]ny person injured in his business

or property by reason of a violation of section 1962" of the statute.  18 U.S.C. § 1964(c).  Section

1962, in turn, makes it "unlawful for any person employed by or associated with any enterprise

engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

racketeering activity."  *Id.* § 1962(c).  "[R]acketeering activity" is defined to include a wide

variety of criminal offenses, including, as relevant here, wire fraud and violations of the Travel

Act.  *Id.* § 1961(1); *see, e.g.*, *Empire Merchants*, 902 F.3d at 139.  "To establish a RICO claim, a

plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to

business or property; and (3) that the injury was caused by the violation of Section 1962.  To

establish a violation of § 1962(c), in turn, a plaintiff must show that a person engaged in

(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Cruz v.*

*FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (cleaned up).  Meanwhile, to establish a

RICO conspiracy claim, a plaintiff must allege that the defendant participated in "an agreement

to violate RICO's substantive provisions.'"  *One World, LLC v. Onoufriadis*, No. 21-374-CV,

2021 WL 4452070, at *1 (2d Cir. Sept. 29, 2021) (summary order) (quoting *Williams v. Affinion*

*Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018)).

Measured against these standards, COD's RICO claims fall short for several reasons. The Court will begin with the substantive RICO claim before turning to the conspiracy claim.

## 1. Enterprise

First, COD's substantive RICO claim falls short because it fails to allege the existence of an "enterprise" distinct from Polar itself.  A RICO enterprise may be "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004).  Critically, however, RICO "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 195 (1993).  In the case of a corporate entity, that means that the enterprise cannot "consist merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant."  *Cruz*, 720 F.3d at 121 (cleaned up); *accord Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).  The same goes for a group of corporate entities that, though separate in legal form, "operate within a unified corporate structure" and are "guided by a single corporate consciousness."  *Cruz*, 720 F.3d at 121 (cleaned up); *see also, e.g.*, *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017).  This "distinctness" requirement ensures that a corporation cannot be held liable for corrupting itself and that ordinary corporate fraud, conducted by or through employees or agents of a single corporation, cannot be dressed up as a RICO claim.  *FXDirectDealer*, 720 F.3d at 120.

These standards doom COD's claim as pleaded.  At bottom, COD alleges only that Polar associated with its own employees, Polar Management, and companies under the ownership or control of Polar Management to conduct a fraudulent business scheme.  Compl. ¶¶ 21-25.  It is

true that the Complaint alleges that the third-party consulting companies are legally separate

entities.  *See id.* ¶ 23.  But the Complaint alleges nothing about the companies except that they

served as vehicles or fronts, under the control of Polar Management, for Polar to receive off-the-

books income and as a way for Polar to attract more customers by quoting deceptively low

prices.  *Id.* ¶¶ 106-07.  Put differently, COD's own allegations establish that the third-party

consulting companies acted as instrumentalities of Polar — agents through which Polar received

bribes related to its cargo shipping business.  Such allegations fail to meet the distinctness

requirement.  *See, e.g.*, *In re Parmalat Sec. Litig.*, 479 F. Supp. 2d 332, 346-47 (S.D.N.Y. 2007)

(concluding that an enterprise consisting of a corporation, its subsidiaries, and "dummy" third-

party entities, which the corporation used to conceal its losses, failed the distinctness test);

*Palatkevich v. Choupak*, No. 12-CV-1681 (CM), 2014 WL 1509236, at *12-15 (S.D.N.Y. Jan.

24, 2014) (finding that an association-in-fact enterprise consisting of six related corporate

entities and three individual employees of those entities failed the distinctness requirement

because the entities were under common management and failed to respect corporate

formalities); *Fossil Grp., Inc. v. Angel Seller LLC*, 627 F. Supp. 3d 180, 200-01 (E.D.N.Y. 2022)

(concluding that an alleged enterprise consisting of two corporate entities failed to satisfy the

distinctness requirement because one had authorized the other to act on its behalf).

  COD's argument to the contrary is unpersuasive.  Citing to *Securitron Magnalock Corp.

v. Schnabolk*, 65 F.3d 256, 263 (2d Cir. 1995), COD argues that the absence of a formal

relationship between Polar and the third-party consulting companies, combined with the fact that

the activities of the consulting companies were independent from any of Polar's legitimate

business activities, establishes that Polar is distinct from the consulting companies.  ECF No. 17

("Pl.'s Opp'n"), at 9-10.  But *Securitron* is distinguishable.  There, the facts established an

enterprise consisting of an individual and two corporate entities that the individual operated. 65

F.3d at 263. The two corporate entities were in distinct lines of work, had their own employees,

and were active and independent businesses. *Id. Securitron* certainly illustrates that corporate

entities under the same management *can* be distinct for RICO enterprise purposes, but there must

be evidence (or, at the pleading stage, allegations) that they are distinct entities, not merely

instrumentalities or agents of one another. *See also Lavastone Cap. LLC v. Coventry First LLC*,

No. 14-CV-7139 (JSR), 2015 WL 1939711, at \*1, 6 (S.D.N.Y. Apr. 22, 2015) (holding that an

enterprise consisting of parent and subsidiary corporations, and their executive officers, satisfied

the distinctness requirement because the corporations were separate entities with "unique

functions"). Here, by contrast, the Complaint alleges no facts suggesting that the third-party

consulting companies operated independently from Polar. *See* ECF No. 20 ("Def.'s Reply"), at

3-4. That failure to allege a distinct enterprise is fatal to COD's substantive RICO claim.

### 2. Pattern of Racketeering

In any event, even if COD did plausibly allege the existence of a RICO "enterprise," its

claims would fail for an alternative reason: a failure to plausibly allege a pattern of racketeering.

As noted, to state a RICO claim, a plaintiff must plausibly allege "a pattern of racketeering

activity," 18 U.S.C. § 1962(c) — that is, that the defendant committed at least two "predicate

acts," *id.* § 1961(5); *see DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001). In this case, COD

alleges that Polar committed at least two acts of (1) tax fraud; (2) violations of the Travel Act;

and (3) wire fraud. Compl. ¶¶ 111-13. But none of COD's allegations pass muster.

COD's allegations of tax fraud are most easily rejected. The RICO statute sets forth an

"exhaustive list of predicate acts that qualify as 'racketeering activity,'" *Lynch v. Amoruso*, 232

F. Supp. 3d 460, 466 (S.D.N.Y. 2017), and tax fraud is not among them, *see* 18 U.S.C.

§ 1961(1); *see United States v. Watts*, No. 09-CR-62 (CM), 2011 WL 167627, at *6 (S.D.N.Y. Jan. 11, 2011) ("[T]he tax fraud offense is not itself a RICO predicate."). COD's response — which, perhaps tellingly, is relegated to a footnote — is that the "statute does not contain any text precluding tax evasion from being a racketeering predicate." Pl.'s Opp'n 19 n.11. But that does not cut it, as the law in this Circuit (ignored by COD in favor of non-binding precedent) is unambiguous that an offense "*must* be among the various criminal offenses listed in § 1961(1)" to qualify as a RICO predicate. *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (emphasis added). To the extent that courts have suggested or held that tax fraud could support a RICO claim, it has generally been where the defendant mailed fraudulent tax returns and, thus, committed the offense of wire fraud (which is among those offenses listed in Section 1961(1)). *See, e.g.*, *United States v. Porcelli*, 865 F.2d 1352, 1355-60 (2d Cir. 1989); *United States v. Busher*, 817 F.2d 1409, 1412 (9th Cir. 1987) (holding that tax fraud is not a RICO predicate, but "mailing fraudulent tax returns is indictable as mail fraud"); *cf. Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 487 (2006) (Breyer, J., concurring) (noting that the alleged RICO predicate act — filing a false sales tax return — was "indictable under the federal mail fraud statute"); *United States v. Young & Rubicam, Inc.*, 741 F. Supp. 334, 338 (D. Conn. 1990) ("The mail fraud statute may be a RICO predicate even though defendants' conduct may violate another, more specific statute which is not a RICO predicate."). COD makes no claim here that Polar mailed fraudulent tax returns.[2] Accordingly, COD cannot base its substantive RICO claim on the allegation that Polar committed tax fraud.

---

[2]    Even if COD did, it is far from clear that such a tax fraud scheme would have caused injury to COD's business, as required by the RICO statute. *See* 18 U.S.C. § 1964(c).

COD's arguments based on the Travel Act, 18 U.S.C. § 1952 — similarly relegated to a footnote, *see* Pl.'s Opp'n 19 n.10; Compl. ¶ 132 — can also be relatively quickly dispatched. The Travel Act prohibits travel or use of "any facility" of interstate or foreign commerce with the intent to promote unlawful activity. *United States v. Walsh*, 700 F.2d 846, 852-53 (2d Cir. 1983); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 595 (S.D.N.Y. 2014), *aff'd* 833 F.3d 74 (2d Cir. 2016). Here, COD alleges that Polar Management used interstate facilities and traveled interstate from New York to Connecticut, California, and other states to, "upon information and belief, launder the 'consulting fee' payments through the Consulting Companies and conduct other unlawful activity." Compl. ¶¶ 113, 132. In other words, money laundering is the specified "unlawful activity" underlying Polar's alleged Travel Act violations. As relevant here, to plausibly establish that Polar Management was engaged in money laundering, COD must allege that Polar conducted or attempted to a conduct a financial transaction involving "the proceeds of specified unlawful activity . . . knowing that the transaction [was] designed" to conceal the nature of the money or "to avoid a transaction reporting requirement." 18 U.S.C. § 1956(a)(1).

COD's allegations fall short for two reasons. First, the Complaint is devoid of facts supporting an inference that Polar knew any transaction involving the consulting fees was designed to conceal the fees or avoid reporting requirements. In support of its money laundering claim, COD points to three paragraphs in the Complaint, *see* Pl.'s Opp'n 19 n.10, one of which merely asserts in conclusory fashion that Polar Management laundered the consulting fees, Compl. ¶ 113, and two of which allege that the consulting fees enabled Polar to receive "off the books" income, thereby lowering its payroll tax liability, *id.* ¶¶ 107-08. But even if the consulting fee payments did, in fact, lower Polar's payroll tax liabilities, these allegations do not support an inference that Polar *knew* this was a purpose of the payments to the consulting

10

companies.  Absent plausible allegations of Polar's knowledge, COD fails to allege that Polar

engaged in money laundering.  *See Entretelas Americanas S.A. v. Soler*, No. 19-CV-03658

(LAK), 2020 WL 9815186, at *9 (S.D.N.Y. Feb. 3, 2020) (concluding that the plaintiff had

failed to allege money laundering as a RICO predicate because, *inter alia*, the complaint lacked

non-conclusory allegations regarding scienter and, at best, made threadbare claims that the

defendant "transferred the monies to avoid unspecified taxation"), *report and recommendation*

*adopted by* ECF No. 29 (Mar. 10, 2020), *aff'd*, 840 F. App'x 601 (2d Cir. 2020) (summary

order), *as amended* (Jan. 7, 2021).  And absent plausible allegations of money laundering,

COD's claims of Travel Act violations fail.  *See Cintas Corp. v. Unite Here*, 601 F. Sup. 2d 571,

578 (S.D.N.Y. 2009) (rejecting a Travel Act claim as a RICO predicate where the plaintiff failed

to show that the defendant's conduct constituted a specified unlawful activity); *Kashelkar v.*

*Rubin & Rothman*, 97 F. Supp. 2d 383, 393 (S.D.N.Y. 2000) (same).

  Second, COD's reliance on the Travel Act fails for an independent reason: The

Complaint does not allege any facts suggesting that Polar Management traveled in interstate

commerce or used a facility of interstate commerce for the purpose of money laundering.  *See*

Def.'s Mem. 13.  COD claims that Polar Management generally used facilities engaged in

interstate commerce — a cargo airline and airports — and that members traveled from New

York to Connecticut, California, and other states, to launder the consulting fees.  Compl. ¶ 113.

But the Complaint does not allege who traveled and where, or how the travel or use of the cargo

airline facilitated the money laundering.  At bottom, COD's allegations of Travel Act violations

consist of only "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements."  *Iqbal*, 556 U.S. at 678.  That is insufficient.

COD comes closest with its third alleged predicate — wire fraud — if only because there

is good reason to believe that members of Polar Management engaged in fraud and used wires in

furtherance of the scheme.[3]  But here too, it falls short as the Complaint fails to sufficiently

allege a fraud scheme of which COD was a victim.  "A complaint alleging . . . wire fraud must

show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional

participation in the scheme, and (3) the use of interstate . . . transmission facilities in furtherance

of the scheme."  *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir.

1996).  Significantly, allegations of wire fraud are subject to the heightened pleading standards

set forth in Rule 9(b), which requires that a plaintiff "state with particularity the circumstances

constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see, e.g.*, *Spool*, 520 F.3d at 185; *Moore v.

PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999) (holding that Rule 9(b)'s particularity

requirements apply to "RICO claims for which fraud is the predicate illegal act").  COD "need

not specify the time, place and content of each" wire.  *Lewis Fam. Grp. Fund LP v. JS Barkats

PLLC*, No. 16-CV-5255 (AJN), 2021 WL 1203383 (S.D.N.Y. Mar. 31, 2021) (internal quotation

marks omitted), *adopted*, 2021 WL 4341080 (S.D.N.Y. Sept. 23, 2021); *cf. Sanchez v. ASA Coll.,

Inc.*, No. 14-CV-5006 (JMF), 2015 WL 3540836, at *6 (S.D.N.Y. June 5, 2015) (noting that

where a plaintiff "claims that specific statements . . . were themselves fraudulent, *i.e.*, themselves

contained false or misleading information, the complaint should specify the fraud involved,

identify the parties responsible for the fraud, and where and when the fraud occurred" (internal

quotation marks omitted)).  But it must, at a minimum, allege the *scheme* to defraud with

---

[3]     That conclusion is certainly corroborated by the later indictment of several Polar
executives (and COD's owner and operator) for wire fraud and conspiracy to commit wire fraud
— though the Court may not, and does not, consider the indictment for its truth here.

particularity.  *See, e.g.*, *Williams v. Equitable Acceptance Corp.*, 443 F. Supp. 3d 480, 489-90

(S.D.N.Y. 2020); *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

COD fails to do so.  To be sure, COD alleges a fraudulent scheme in which Polar

Management required freight forwarders, including COD, to make illicit payments disguised as

legitimate consulting fees.  Compl. ¶¶ 21, 28, 71-72.[4]  But it does not allege with the requisite

particularity how this fraudulent scheme began or operated.  Most importantly, COD does not

allege any particularized basis for why it believed that it was required to pay the additional fees,

let alone why it believed they were legitimate consulting fees rather than illicit payments.  *See*

Def.'s Mem. 16-17; *see also Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125 (2d Cir. 2018)

("The complaint here lacks the particularized allegation of an underlying 'scheme to defraud'

animated by a material misrepresentation.").  At best, COD states that it "was advised by

members of Polar management that it was required to also pay Polar (via Polar Management),

and certain third-party consulting companies connected to Polar, additional 'consulting fees,'"

Compl. ¶ 21; that "[t]he consulting fee requirement was articulated to COD by multiple members

of Polar Management over the course of seven years," *id.* ¶ 28; and that it had to pay these fees

via bank wire, *id.* ¶ 34.  But these are not particularized allegations illustrating a scheme to

defraud, as required by Rule 9(b).  The Complaint does not, for example, establish who from

Polar told COD about the consulting fees, when COD first learned about the fee requirement,

and what Polar Management told COD to misrepresent the illicit nature of the fees.  *Cf.*

*Equitable Acceptance Corp.*, 443 F. Supp. 3d at 489-90 (holding that the plaintiff adequately

pleaded a scheme to defraud by describing, in detail, how agents of the defendants

---

[4]     COD also alleges fraudulent statements in connection with the PIPA agreement, *see, e.g.*, Compl. ¶¶ 45-48, 50, but these allegations are relevant only to its common-law fraud claims, not to its RICO claims.  *Compare id.* ¶¶ 100-03 *with id.* ¶¶ 142-51, 153; *see also* Def.'s Reply 8.

misrepresented their services to plaintiffs); *Empire United Lines Co. v. Feldman*, — F. Supp. 3d

—, 2022 WL 4111027, at \*1-2 (E.D.N.Y. Sept. 8, 2022) (holding that the plaintiff adequately

pleaded a scheme to defraud by describing, in detail, the mechanics of the scheme).

Although COD briefly describes the "customary procedure" by which Polar Management

communicated the consulting fees to COD, Compl. ¶ 40, this does not salvage the claim.  COD

identifies only one communication from Polar that it describes as illustrative of the scheme: an

email dated March 1, 2021, from Abilash Kurien, a Polar executive, to the operator of COD

breaking down the consulting fee payments for January 2021.  *Id.* ¶¶ 41-42; ECF No. 1-2.  But

these allegations demonstrate nothing more than the fact that Kurien directed COD to make

various payments.  They do not demonstrate that COD misunderstood the nature of the payments

— which is an essential aspect of alleging a scheme to defraud of which COD (as opposed to,

say, Polar itself) was the victim.  In fact, if anything, the email suggests COD's awareness of the

illicit nature of the payments, as Kurien told the operator of COD: "bro here is the updated sheet

- pls use this for distribution.  Please make sure amounts are transferred the way I have laid it

out," and lists dollar amounts going to specific individuals.  ECF No. 1-2.  COD does not allege

any initial communication that misrepresented the nature of these or any other "consulting" fees;

without such allegations, it fails to plead a scheme to defraud with the requisite particularity.  *See*

*Affinion Grp.*, 889 F.3d at 125.  In short, COD provides no factual basis for its claim that it was

misled or defrauded by Polar.  Accordingly, it fails to establish wire fraud predicate acts as well.

In sum, COD fails to adequately plead that Polar committed *any* predicate acts, let alone

a *pattern* of racketeering activity.  Thus, its substantive RICO claim must be and is dismissed.[5]

---

[5]      In light of the foregoing conclusions, the Court need not and does not reach Polar's
argument that COD fails to establish open-ended or closed-ended continuity, as required to plead
a pattern of racketeering activity.  *See* Def.'s Mem. 11-15.

### 3. RICO Conspiracy

As noted, COD also brings a RICO conspiracy claim against Polar.  Compl. ¶¶ 122-136.

"[T]o adequately plead a RICO conspiracy under 18 U.S.C. § 1962(d), 'a plaintiff must allege

the existence of an agreement to violate RICO's substantive provisions.'"  *Onoufriadis*, 2021

WL 4452070, at *1 (quoting *Affinion Grp.*, 889 F.3d at 124).  Although "the requirements for

RICO's conspiracy charges under § 1962(d) are less demanding than those for substantive

violations," *City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (summary order), the

Second Circuit has held that where, as here, a plaintiff fails to state a substantive RICO claim,

any claim of conspiracy under Section 1962(d) fails as well, *see Discon, Inc. v. NYNEX Corp.*,

93 F.3d 1055, 1064 (2d Cir. 1996) ("Since we have held that the prior claims do not state a cause

of action for substantive violations of RICO, the present claim does not set forth a conspiracy to

commit such violations."), *vacated on other grounds,* 525 U.S. 128 (1998); *Johnson v. Nextel*

*Comm'cns, Inc.*, 763 F. App'x 53, 56 (2d Cir. 2019) (summary order) ("Since Plaintiffs'

substantive RICO claim is deficient, Plaintiffs' RICO conspiracy claim also fails.").

In any event, COD's RICO conspiracy claim fails for another reason.  COD does not

allege that Polar entered into an agreement to participate in the enterprise's affairs.  *See Hecht v.*

*Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990); *accord Sky Med. Supply Inc. v.*

*SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 230 (E.D.N.Y. 2014).  COD argues that

Polar's admission (through counsel) that its executives perpetrated an illicit payment scheme is

evidence of Polar's knowledge of, and agreement to participate in, the racketeering enterprise.

*See* Compl. ¶¶ 125-26.  The fact that Polar uncovered the scheme after the fact, however, does

not support an inference of Polar's knowledge of, let alone agreement with, the scheme at the

time it was happening.  At most, COD alleges that the consulting fee requirement continued even

15

when the executives employed in leadership positions changed, suggesting that there was a widespread understanding of the scheme. *Id.* ¶ 126(h). But the Complaint lacks any details about when such changes in leadership happened and how the consulting fee requirement continued to be communicated to COD. Put simply, COD seems to assume Polar's knowledge of the enterprise by virtue of its executives' participation in the scheme. *See* Pl.'s Opp'n 20-21 (arguing that Polar intentionally assisted the fraudulent scheme "by turning a blind eye to the fraud by its top executives"). But COD provides no basis for this assumption.

The Complaint appears to rely on a theory that Polar is vicariously liable for the acts of its executives. *See* Compl. ¶¶ 128-29. But COD does not press this theory in its opposition brief. Even if it had, the theory would fail because "courts within the Second Circuit generally do not impose vicarious liability under RICO unless the corporate defendant is a central figure in the RICO scheme." *Makowski v. United Bhd. of Carpenters & Joiners of Am.*, No. 08-CV-6150 (PAC), 2010 WL 3026510, at *6 (S.D.N.Y. Aug. 2, 2010) (cleaned up); *see also USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 328 (S.D.N.Y. 2003) ("Corporations may not be held vicariously liable for the actions of their employees in violation of the RICO statute where the plaintiff has not alleged any facts which portray *the company* as an active perpetrator of the fraud or a central figure in the criminal scheme." (emphasis added) (cleaned up)). To successfully plead vicarious liability, COD would need to show that Polar had knowledge of, or was recklessly indifferent to, the wire fraud scheme. *Makowski*, 2010 WL 3026510, at *6-7. But, as discussed above, COD provides no non-conclusory allegations that Polar contemporaneously knew about, or agreed with, its executives' scheme. *Cf.* Compl. ¶ 130 (stating, in a conclusory fashion, that "Polar agreed to conduct or participate in the conduct of the

16

Enterprise's affairs").  Accordingly, COD fails to establish that Polar knowingly agreed to participate in a racketeering enterprise, so its RICO conspiracy claim fails.

## B.  State-Law Claims

That leaves only COD's state-law claims. In light of the Court's dismissal of its sole federal claims, the Court declines to exercise supplemental jurisdiction over its state-law claims. Pursuant to Title 28, United States Code, Section 1367, a district court has discretion over whether to exercise jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  The Supreme Court and the Second Circuit have made clear, however, that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (per curiam) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).  And here, COD's assertions to the contrary notwithstanding, *see* Pl.'s Opp'n 24, there is no basis to depart from that general rule.  Given the relatively early stage of the case, the traditional "values of judicial economy, convenience, fairness, and comity" that the Court must consider do not counsel in favor of exercising jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  Accordingly, COD's state-law claims are dismissed as well.  *See* 28 U.S.C. § 1367(c); *see also, e.g.*, *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) (recognizing that if a plaintiff's federal claims are dismissed before trial and there has not been a substantial expenditure of resources on the state claims, the latter should generally be dismissed as well); *accord Banco Safra S.A.-Cayman Islands Branch v. Andrade Gutierrez Int'l S.A.*, No. 16-CV-9997 (JMF), 2018 WL 1276847, at *5 (S.D.N.Y. Mar. 8, 2018).

**CONCLUSION**

For the foregoing reasons, Polar's motion to dismiss must be and is GRANTED.  That

leaves only the question of whether COD should be granted leave to amend its complaint, which

it requests.  *See* Pl.'s Opp'n 25 n.13.  The Court is skeptical that COD can cure the defects in its

claims (especially insofar as the subsequent indictment raises the possibility that COD was

complicit in, rather than a victim of, any fraud by executives at Polar).  Moreover, COD was

already given one opportunity to amend, *see* ECF No. 16, which it did not use.  That said,

mindful that leave to amend a complaint should be freely given "when justice so requires," Fed.

R. Civ. P. 15(a)(2), and that "[c]omplaints dismissed under Rule 9(b)" — which is, in part, the

case here — "are almost always dismissed with leave to amend," *Pasternack v. Shrader*, 863

F.3d 162, 175 (2d Cir. 2017) (internal quotation marks omitted), the Court will grant COD one

final opportunity to amend.  COD shall file any amended complaint **within thirty days of this**

**Opinion and Order.**


        SO ORDERED.

Dated: July 11, 2023                                    _____
        New York, New York                                    JESSE M. FURMAN
                                                        United States District Judge

18